**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**


DAVID PRESTON PARDUE
ADC #93335                                                                                              PETITIONER


VS.                                                    5:06CV00184 JMM/JTR


LARRY NORRIS, Director,
Arkansas Department of Correction                                                      RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge James M. Moody.  Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Clerk no later than eleven (11) days from the date of the findings and recommendations.  The copy will be furnished to the opposing party.   Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.      An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A 149
> Little Rock, AR 72201-3325

## I. Background

On March 7, 2003, Petitioner, David Preston Pardue, pleaded guilty to one count of aggravated robbery and two counts of aggravated assault in Washington County Circuit Court. (Tr. 11-13.)[1]  Based on these convictions, the court sentenced Petitioner to a total of 24 years' imprisonment in the Arkansas Department of Correction ("ADC"). (Tr. 11-13.)

On June 5, 2003, Petitioner filed a timely *pro se* Motion for Rule 37 relief in the Washington County Circuit Court, alleging: (1) prosecutorial misconduct; (2) various errors in the plea proceedings; and (3) ineffective assistance of counsel. (Tr. 21-29.) On August 29, 2003, Petitioner

---

[1]Citations to "Tr." refer to the record lodged in Petitioner's Rule 37 appeal, which includes the transcripts of Petitioner's guilty plea and Rule 37 hearing. This consecutively paginated record is docketed as Exhibits 5-10 to docket entry #12.

filed a *pro se* amendment to his Rule 37 petition to include additional ineffective assistance of counsel claims.  (Tr. 43-52.)  Petitioner later retained counsel who filed a third Petition for Rule 37 relief on January 8, 2004.  (Tr. 66-71.)  After conducting an evidentiary hearing on January 9, 2004 (Tr. 115-215), the Court entered an Order denying Rule 37 relief. (Tr.108-111.)

Petitioner appealed the denial of Rule 37 relief to the Arkansas Supreme Court where he argued that: (1) he was not competent to enter a guilty plea; (2) his guilty plea was not knowing and voluntary; (3) his plea should be voided because he did not acknowledge the factual basis for the plea; and (4) his sentence as a habitual offender should also be voided.  *See Pardue v. State*, 363 Ark. 567, 215 S.W.3d 650 (2005).  On October 13, 2005, the Court rejected these arguments on the merits and affirmed.  *Id.*

On November 28, 2005, Petitioner filed a state habeas action in Jefferson County Circuit Court challenging the charging information because it failed to include the statutory elements for aggravated robbery.  (Docket entry #12, Ex. 11, Abstract at 1.)  On January 10, 2006, the court dismissed Petitioner's state habeas action, and Petitioner appealed to the Arkansas Supreme Court.  (Docket entry #12, Ex. 11, Abstract at 45.)

On July 6, 2006, while Petitioner's state habeas appeal was pending, he filed this federal habeas action. (Docket entry #2.)  On January 18, 2007, the Arkansas Supreme Court affirmed the lower court's dismissal of Petitioner's habeas petition.  *Pardue v. Norris*, 2007 WL 117427 (Ark. 2007) (unpublished *per curiam*).  On July 11, 2007, Petitioner obtained leave of this Court to file an amended habeas petition, raising an additional ground for habeas relief that had previously been asserted in his state habeas action.  (Docket entries #25 and #33.)

Petitioner asserts four grounds for federal habeas relief:  (1) he was incompetent to enter a

3

guilty plea; (2) he did not enter a knowing and voluntary guilty plea; (3) his guilty plea was involuntary because he was subjected to torture by jail deputies; (4) his guilty plea was invalid because the trial court failed to set forth the factual basis for the guilty plea; and (5) the charging information filed against him was defective.   (Docket entries #2 and #33.)

Respondent argues that all of these grounds for habeas relief are without merit. (Docket entry #11.)   For the reasons explained below, the Court agrees with Respondent's arguments.   Thus, the Court recommends that the Petition for a Writ of Habeas Corpus be denied, and the case be dismissed, with prejudice.

## II.  Discussion

### A.     Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth the standard of review applicable in federal habeas cases.   Under this legislation, a habeas petitioner may not obtain relief with respect to any claim adjudicated on the merits in a state court proceeding unless he shows that the prior adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. *See* 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An unreasonable application of clearly established federal law is one in which "the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*   A presumption of correctness attaches to factual determinations made by a state court, and a habeas petitioner must rebut this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

**B.     Analysis of Petitioner's Habeas Claims**

**1.     Alleged Lack of Competence to Enter a Guilty Plea**

According to Petitioner, he was not legally competent to plead guilty.  Before addressing the merits of this argument, the Court will review the pertinent facts.

On August 5, 2002, Petitioner was charged in Washington County Circuit with one count of Class Y aggravated robbery and two counts of Class D aggravated assault, based on a Wal-Mart shoplifting incident where Petitioner allegedly attempted to stab an employee and struck two other persons in a vehicle while fleeing.  (Tr. at 5-6.)  On October 22, 2002, an Amended Information was filed adding a count charging Petitioner as a habitual offender.  (Docket entry #22, Exhibit 4.)   Prior to trial, Petitioner was scheduled for a forensic psychiatric evaluation.

At a pretrial hearing on February 4, 2003, psychiatrist Robin Ross, M.D., testified by telephone.  (Tr. 233-251.)  According to Dr. Ross's testimony, Petitioner appeared at her clinic for a forensic psychiatric evaluation on January 30, 2003, but refused to answer any questions, including even those seeking basic demographic information.  (Tr. 236.) While Petitioner did not exhibit any abnormal behavior, Dr. Ross testified that she could not assess him because he refused to answer any questions. (Tr. 245.)  At a hearing the following day, the trial court granted Petitioner's request for Dr. Ross to perform a second psychiatric evaluation.  (Tr. 257.)

On February 7, 2003, Dr. Ross performed her second evaluation of Petitioner.  (Docket entry

#2 at 105.)  In a letter-report to the court, filed on February 12, 2003, Dr. Ross opined that: (1) Petitioner had the capacity to understand the proceedings and assist counsel in his defense; (2) did not have a mental defect but was Malingering along Axis I of DSM-IV, with no diagnosis along Axis II; and (3) did not have a mental disease or defect at the time of the alleged conduct, and had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.[2]  (Docket entry #2 at 105.)

Petitioner was scheduled to go on trial on March 7, 2003.  He was represented by three retained lawyers: Ernie Witt, Ann Donovan, and Charles Stutte.  (Tr. 252.)  On the morning of trial, Petitioner, his attorneys and the prosecutor, entered into plea negotiations, which resulted in a plea agreement.

During the plea colloquy (Tr. 252-267), the following exchange took place concerning whether Petitioner was taking any medications:

THE COURT:      Are you under any medications, tranquilizers, or receiving medical treatment?

PETITIONER:      I take some pills, yes.

THE COURT:      What kind of pills?

PETITIONER:      Darvocet now and Zoloft, and --

THE COURT:      Does the medication you're taking or the treatment you're receiving or the condition for which you are being treated affect your ability to understand this proceeding?

PETITIONER:      No.

---

[2]While Dr. Ross's letter-report was filed with the trial court on February 12, 2003, it appears that it was not introduced as an exhibit in Petitioner's Rule 37 proceeding.  While Petitioner's Rule 37 appeal was pending before the Arkansas Supreme Court, the State supplemented the record to include a copy of the letter-report.  (Docket entry #2 at 101-104.)

THE COURT:      Do you have any questions?

PETITIONER:     No.

THE COURT:      Is there anything at all you don't understand?

PETITIONER:     No.

(Tr. 260.)  This was the extent of the discussion regarding Petitioner's medications and Petitioner's

plea ultimately was accepted by the Court.

At Petitioner's Rule 37 hearing, attorney Witt testified that he was one of three lawyers

retained to represent Petitioner, and that he had primary responsibility for trying the case.[3]  (Tr. 122-

123.)  According to Witt, the morning of trial, plea negotiations began with the prosecuting attorney.

(Tr. 124.)  Witt was not aware that Petitioner was taking any prescription medications on the day of

trial.  (Tr. 130-131.)  When asked whether this knowledge would have caused him to deal differently

with Petitioner, Witt answered as follows:

> I don't think it would have.  It would have caused me to pause, possibly question him
> more thoroughly, maybe talked more with him even though we did talk extensively,
> Mr. Stutte talked to him extensively.  It might have caused me to pause.  But don't
> forget something, I was satisfied he understood what he was doing.  Whether I was
> right in being satisfied or wrong in being satisfied, I've been doing this thirty-five
> years and this is not the first plea I've ever dealt with.  I was satisfied and historically,
> sir, he was not the easiest person to communicate with.
>
> * * *
>
> I simply mean that there were times I believe [Petitioner] played a little cat and
> mouse with me and the others but after the many times I talked with him I was
> satisfied on that morning that he knew what he was doing.  I wasn't satisfied that he
> was as normal as I hope you or I hope I am but I was satisfied that he knew what he
> was doing.  Otherwise, I would not have presented him to Judge Storey for purposes
> of entering a plea.

---

[3]During the Rule 37 hearing, Petitioner was represented by retained counsel, Larry Froelich
and George Oleson.  (Tr. 114.)

(Tr. 131.)  Petitioner appeared sober, and did not seem to be high on drugs or alcohol.  (Tr. 136.)

Witt added that Petitioner was always "slow when you communicated with him" and for that reason

the three lawyers were methodical in explaining things to him.  (Tr. 136-137.)

Jail medication administration records introduced at the Rule 37 hearing indicated that, in

the 24 hours preceding the plea hearing, Petitioner took: (1) Amitriptyline 25mg; (2) Zoloft 50mg;

(3) Excedrin Migraine; (4) Amoxicillin 500mg; (5) Atenolol 25mg; and (6) Propopoxy-N 100

[Darvocet].[4]  (Tr. 274-83.)   Psychologist Steven Nichols, PhD, testified that, pursuant to the

Physician's Desk Reference ("PDR"), Amitriptyline was a traditional tricylcic antidepressant that

produces sedation and relieves depression.  (Tr. at 163.)   Zoloft was a newer antidepressant

Serontonin up-take inhibitor.  (Tr. at 164.)  Darvocet was a narcotic pain medication for moderate

to severe pain that had side effects of sedation and dizziness.[5]  (Tr. 164.)

Dr. Nichols testified that the PDR cautioned physicians against prescribing Darvocet to

patients taking tranquilizers or anti-depressants. (Tr. 167.)  Amitriptyline, Zoloft, and Darvocet were

all considered central nervous system depressants and "could have an additive effect, that is if a

person took all three drugs they could have a significant effect on the depression of the central

nervous system . . . basically a sedating effect." (Tr. 167.)  In Dr. Nichols's view, it would "not be

a good thing to be taking these drugs, particularly the Darvocet, at the time anyone was making an

---

[4]According to the jail medication records, Petitioner began taking Darvocet, apparently for
a dental problem, on the evening of March 3, 2003.  (Tr. 273, 283.)   He began taking the other
medications several weeks before the March 7, 2003 plea hearing.

[5]Dr. Nichols was not asked any questions concerning Petitioner's other medications.
According to the *Physician's Desk Reference* ("PDR") (62nd Ed. 2008), Excedrin Migraine is a non-
prescription acetaminophen/aspirin pain reliever; Amoxicillin is an antibiotic; and Atenolol is a beta-
blocker.

important, cognitive decision." (Tr. 170.) Dr. Nichols acknowledged that users of Darvocet acclimate to it over a period of days, so that the first one or two doses would have a stronger effect than subsequent ones. (Tr. 171.) Dr. Nichols also admitted that he had never seen Petitioner, and that he did not know how Petitioner's medications affected him, if at all, on March 7, 2003. (Tr. 173.)

Petitioner testified that he was expecting to go to trial on March 7, 2003. (Tr. 181.) He was taking Amitriptyline, Zoloft, Darvocet, Excedrin Migraine, an antibiotic, and a blood pressure pill during the month or two leading up the trial date. (Tr. 182.) The morning of March 7, he took a Darvocet, which had been prescribed two or three days earlier by a dentist. (Tr. 182-83.) Petitioner testified that taking the Darvocet "slowed him down." (Tr. 184.)

According to Petitioner, he was stunned, when on the morning of trial, his lawyers presented him with a plea proposal and advised him that they did not think they could win at trial. (Tr. 187-88.) Petitioner described being "blank" and "at a loss for words." (Tr. 188.) Petitioner also stated that, during the plea colloquy, the trial court cut him off after he started listing the medications he was taking. (Tr. 193.)

In its Order denying Rule 37 relief, the trial court found that Petitioner had the capacity to enter his guilty plea. (Tr. at 110.) In Petitioner's Rule 37 appeal, the Arkansas Supreme Court rejected Petitioner's competency argument:

> Rule 24.5 of the Arkansas Rules of Criminal Procedure requires the trial court to determine that a plea is voluntary prior to accepting a guilty or nolo contendere plea. The rule further requires the trial court to determine if the tendered plea is the result of a plea agreement, and if it is, to require that the agreement be stated. The rule is mandatory. *Reed v. State*, 276 Ark. 318, 635 S.W.2d 472 (1982). It is the duty and responsibility of the trial court to determine beyond doubt that a plea of guilty is voluntary, and in order to do so, the court should inquire of the defendant personally,

substantial compliance being sufficient. *Id.* at 321, 635 S.W.2d at 474. Reversal is not mandated where deficiencies in the proceeding are supplied at a postconviction hearing. *Id.* Further inquiry is necessary when, and only when, a court has reason to doubt the defendant's competence. *See Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

Here, the trial court did question appellant during the plea hearing as to the voluntariness of his decision and asked if the appellant was under any medication. When appellant responded, the trial court interrupted to ask whether the medication appellant was taking, or any treatment appellant was receiving, affected his ability to understand the proceedings. Appellant responded, without reservation, that they did not and also responded to his own counsel's question that he had agreed to the plea agreement knowingly and soberly.

Furthermore, appellant's psychiatric evaluation indicated he was competent and did not have a mental defect. The diagnosis for his mental disorder was malingering. The psychologist who testified concerning the sedating effects of the drugs was not able to say how or whether the drugs did, in fact, affect the appellant. Appellant does not point to any evidence in the transcript of the plea hearing that would indicate he was confused or that he did not understand the proceedings. We cannot conclude the trial court erred by determining the appellant was competent. While the trial court may not have waited to hear all of the drugs appellant was taking, the judge did question appellant sufficiently to observe his demeanor and did inquire concerning the effects of the drugs and any treatment. See *Pettit v. State*, 296 Ark. 423, 758 S.W.2d 1 (1988).

Appellant further asserts under this point that the order denying postconviction relief did not specify sufficient facts upon which to base the holding. The court's order specifically referenced the diagnosis of malingering in the competency report and found the defendant did not lack the capacity to voluntarily waive his rights during the plea hearing. While not directly stated, it is clear that the trial court simply did not believe the appellant's testimony that the medication had incapacitated him, and that the trial court did not find that the appellant's manner and conduct during the plea hearing raised any doubt concerning appellant's competency. The trial court is in the best position to resolve any conflicts in testimony. *Snelgrove v. State*, 292 Ark. 116, 728 S.W.2d 497 (1987). The judge at a postconviction-relief hearing is not required to believe the testimony of any witness, particularly that of the accused. *Skeels v. State*, 300 Ark. 285, 779 S.W.2d 146 (1989). For these reasons, we are satisfied the plea here was voluntary.

*Pardue*, 363 Ark. at 571-72, 215 S.W.3d at 654-55.

Petitioner argues that the trial court's failure to hold a *sua sponte* competency hearing during

his guilty plea violated his due process rights. According to Petitioner, the combination of his prescription medications and the rushed circumstances surrounding his guilty plea should have compelled the trial court to conduct a competency hearing before proceeding with the plea. Applying the applicable habeas standard for evaluating this argument, the Court disagrees.

In analyzing the issue of Petitioner's competence to enter a guilty plea, the Arkansas Supreme Court relied on *Godinez v. Moran*, 509 U.S. 389 (1993), the controlling case on this point. According to the Court in *Godinez*, a defendant is competent if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Godinez*, 509 U.S. at 396 (quoting *Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*)).  The competency standard is the same whether a defendant is proceeding to trial or if he is pleading guilty.  *Godinez*, 509 U.S. at 389-99.

Importantly, a competency determination is only necessary where a trial court "has reason to doubt the defendant's competence." *Godinez*, 509 U.S. at 401 n.13 (citing *Drope v. Missouri*, 420 U.S. 162, 180-81 (1975) and *Pate v. Robinson*, 383 U.S. 375, 385 (1966)); *see also Griffin v. Lockhart*, 935 F.2d 926, 929-30 (8th Cir. 1991) ([i]f there is sufficient doubt about the mental competency of an accused, a trial court has a responsibility to order a hearing *sua sponte*.") (citing *Drope*).  While the United States Supreme Court has not prescribed any "fixed or immutable" signs that create sufficient doubt about competency indicating the need for a hearing, factors for consideration include: (1) evidence of irrational behavior by the defendant; (2) the defendant's demeanor at trial; and (3) any prior medical opinion of the defendant's competency to stand trial. *Griffin v. Lockhart*, 935 F.2d 926, 930 (8th Cir. 1991) (citing *Drope*, 420 U.S. at 180).  An express doubt from defense counsel is also a factor that may be considered.  *Id.*

11

Petitioner's pretrial psychiatric evaluation, performed just one month before the plea, indicated that Petitioner was competent and could assist counsel.[6]  The record does not reflect any instance of Petitioner acting irrationally during the plea proceeding.  Quite the opposite, the record indicates that Petitioner appropriately and directly responded to the trial court's questions.  Thus, the trial court had the opportunity to interact with Petitioner and observe his demeanor.  Although the transcript reflects that Petitioner did not finish listing all of his medications, he clearly affirmed that his medications did *not* affect his ability to understand the proceedings.

The trial court also had the benefit of counsel's observations and interactions with Petitioner.  The entirety of the transcript shows that Petitioner was appropriately engaged with the court and counsel.  Moreover, while defense counsel characterized Petitioner as always being "slow" in communicating with him,  he testified that he did not have doubts about Petitioner's fitness to proceed to trial to enter his guilty plea.   Finally, Dr. Nichols' testimony concerning the potential effects of Petitioner's medications was speculative, as he conceded that he had not observed Petitioner and did not know if or how Petitioner was actually affected by those medications.

 Under these circumstances, the Court concludes Petitioner has failed to show that the Arkansas Supreme Court's competency analysis was contrary to, or an unreasonable application of, federal law, or that it was an unreasonable determination of the facts based on the record of the state court proceeding.  Thus, the Court recommends that this ground for habeas relief be denied.

---

[6]Petitioner argues at length that Dr. Ross's letter-report was improperly considered by the court in his Rule 37 proceeding because it was "not admitted into evidence".  However, regardless of whether the report was formally introduced at the Rule 37 hearing, it was filed in Petitioner's criminal case, cited by the trial court in denying Rule 37 relief, and is an express factor that is relevant to the competency analysis. *See Drope*, 420 U.S. at 180.

###   2.   Alleged Unknowing Nature of Petitioner's Guilty Plea

Petitioner also argues that, based on the combination of his previous claim of incompetency and his understanding that he would serve only 8 years or less of "down time,"[7] his guilty plea was not knowing and voluntary.   Before addressing the merits of this argument, it is important to understand the discussions that took place during the plea colloquy about the length of the sentence Petitioner would receive if he pled guilty.

This colloquy began with Petitioner  answering "yes" to the court's question: Do you wish to change your plea to guilty? (Tr. 258.)  The court then asked whether Petitioner understood that he could receive 10 to 40 years, or life imprisonment, on the aggravated robbery charge, and up to 6 years each on the aggravated assault charges.[8]  (Tr. 258.)  Petitioner answered yes.  (Tr. 258.) Petitioner then answered questions from the court aimed at establishing that he was knowingly waiving his right to a jury trial; the right to remain silent; and the right against self-incrimination. Petitioner then affirmed that his decision to enter the plea was voluntary.  (Tr. 258-59.)

The court asked the prosecutor for his sentence recommendation. He recommended a sentence of 12 years on each aggravated assault count, to run consecutive to each other for a total of 24 years, with a concurrent 11-year sentence on the aggravated robbery count. (Tr. 260-261.) The

---

[7]"Down time" is a term that was used repeatedly during Petitioner's plea and sentencing.  As used by the parties to that proceeding, it appears to mean the time a prisoner will actually serve in the ADC before he becomes eligible for parole.

[8]These base sentence ranges are correct according to the statute governing Class Y and D felonies, respectively.  *See* Ark. Code Ann. § 5-4-401.  However, as noted by the Arkansas Supreme Court, they do not reflect the extended ranges of punishment applicable to a habitual offender.  *See* Ark. Code Ann. § 5-4-501. However, Petitioner was exposed to a life sentence on the Class Y felony aggravated robbery regardless of his habitual criminal status.  *See Pardue*, 363 Ark. at 572, 215 S.W.3d at 655.

court asked defense counsel if this was his understanding of the recommended sentence, to which attorney Witt asked: "[W]ould you [referring to the prosecutor] state to the Court what the mathematics are as far as actual down time?" (Tr. 261.)  The prosecutor answered that it would be "less than eight [years]" on the aggravated robbery and "four years down" on the aggravated assault. (Tr. 261.)  When asked by Witt whether the sentences would be concurrent, the prosecutor answered "twenty-four concurrent to the eleven."  (Tr. 261.)

Petitioner then stated that he wanted to speak with his family members "[b]efore this goes any further[.]"  (Tr. 261-62.)  After an off-the-record conversation between Petitioner and Witt, the following exchange occured:

> WITT: Your down time is going to be the same.  You have a question in front of the Court, anything that you don't understand – we discussed you doing eight years in the ADC, did we not?
>
> PETITIONER: Yes.
>
> WITT:  And you agreed to that, did you not?
>
> PETITIONER: Yes.
>
> WITT:  Judge, I believe [the prosecutor] has stated on the record that his recommendation to the Court would constitute eight years or less in the ADC for the Defendant.
>
> THE COURT: Now, does that clear up your question?
>
> PETITIONER: Eight years.
>
> WITT: Yes, what we discussed.

(Tr. 262.)

Petitioner and Witt then had another off-the-record conversation.  After returning to the record *both* the prosecutor *and* attorney Witt stated that Petitioner was pleading to "one Y" and "two

14

Ds" "with habitual criminal."  (Tr. 263.)  Attorney Donovan then states:  "It's less than eight years.

It's seventy percent."  (Tr. 263.)

A third off-the-record conference took place between Petitioner and attorneys Donovan and

Witt. Mr. Witt returned to the record to state the following:

> WITT:  Can we attorneys just state for the record the plea bargain just briefly?  We
> have met this morning with [Petitioner], all three attorneys, for a lengthy period of
> time at least on two occasions, maybe three, and during that negotiations he has
> agreed and we have recommended that he accept a sentence to the [ADC] which
> would require him to do a minimum of eight years or less and he's agreed to do that,
> have you not, David?
>
> PETITIONER: Yes.
>
> WITT: And you've done so, as you've told the Judge, knowingly and soberly, right?
>
> PETITIONER: Yes.
>
> WITT:  And the offer that Mr. Threet, the prosecutor, has made involves a sentence
> to the ADC actually of somewhat a little less than eight years.
>
> PETITIONER:  Okay.
>
> WITT:  And that is acceptable to you, is it not?
>
> PETITIONER:  Yeah, uh-huh.
>
> WITT:  You need to tell that – the Judge that, not me.
>
> PETITIONER:  Okay.
>
> THE COURT:  You fully understand now what that offer involves?
>
> PETITIONER:  Yes.
>
> THE COURT:  And what the agreement involves?
>
> PETITIONER:  Yes.

(Tr. 263-64.)

15

The court then raised the issue of another theft by receiving case pending against Petitioner, which the State agreed to *nolle prosse*.  (Tr. 264-65.)  The court asked Petitioner if he understood "that goes away," to which he replied yes.

Finally, after the court asked for the factual basis of the charges, the following colloquy took place:

> PROSECUTOR:  [B]ack on July 5th of 2001 [Petitioner] came in and shoplifted a bottle of Aleve from Wal-Mart and when the store security man attempted to stop him, he pulled out a knife and then ran to his truck and got in and when he was driving away there were other employees around the truck, he – not causing serious physical injury but one got hit with the antenna of the truck and another bumped by the truck as he drove off.
>
> THE COURT: He drove his vehicle in the direction of these other employees?
>
> PROSECUTOR: Yes, your honor.
>
> THE COURT: Subjecting them to serious injury or death?
>
> PROSECUTOR:  Yes, your honor.
>
> THE COURT:  I'm going to accept your plea, Mr. Pardue, and find you guilty of aggravated robbery, aggravated assault two counts.  I'll sentence you to eleven years in [ADC] on the aggravated robbery charge, is that correct?
>
> PROSECUTOR:  Yes, your honor.
>
> THE COURT:  And twelve years on the aggravated assault cases; is that correct?
>
> PROSECUTOR:  Yes, your honor, and the two aggravated assaults consecutive for twenty-four.

(Tr. 265-66.) Following a discussion of jail time credits, the plea hearing ended with the following exchange:

> WITT:  And those two sentences are concurrent?
>
> PROSECUTOR:  The twenty-four and the eleven.

16

WITT:  Yes, thank you.

THE COURT:  All right, thank you very much.

(Tr. 267.)

During the Rule 37 hearing, Witt testified  that the morning the case was scheduled to go to trial the parties reached a plea agreement.  (Tr. 129.)  When asked whether the agreement  was for "eight years down" Witt answered yes.  (Tr. 129.)    Witt then answered the following questions about the discussions surrounding Petitioner's sentence:

> FROELICH:  [W]as there any agreement as you recall concerning the actual number of years in this case, twenty-four, that was what was put in the judgment[?]
>
> WITT:  The transcript reflects where that came from.
>
> FROELICH:  All right.  But prior to did you discuss, do you recollect discussing with [Petitioner] that he was going to receive a twenty-four year sentence.
>
> WITT:  I don't recall.  I suspect that I did.  I don't recall specifically that I did.  I did along with Mr. Stutte and Ms. Donovan go over the elements of the plea, that is him [pleading] to the specific charges, what the agreement was and that it would be eight years hard time for him.
>
> FROELICH:  Okay, so that was the agreement, was that whatever the sentence was in terms of years the result was to be for eight years down.
>
> WITT:  That's correct.

(Tr. 129-30.)  Witt recalled that there was talk about whether the "age fifty-five rule" might affect Petitioner's sentence, but no agreement was reached.[9]  (Tr. 130.)  Witt stated that it "was a matter that could be explored once [Petitioner] got down there, if he was eligible for it he would receive it, the Court would have nothing to do with that, I would have nothing to do with that, the [ADC] are

---

[9]The "age 55 rule" appears to be a reference to statutory eligibility for parole for some offenders once they reach that age.  *See e.g.* Ark. Code Ann. § 16-93-1302(f).

the ones that would control that issue." (Tr. 130.)

On cross-examination, Witt testified that attorney Donovan had certified copies of Petitioner's prior convictions, and that he was satisfied Petitioner fell into the range of a habitual offender. (Tr. 133.)   Witt answered "yes" when asked if Petitioner's "actual plea was eleven years on an aggravated robbery and twenty-four years on an aggravated assault, two aggravated assaults stacked to make it twenty-four years?" (Tr. 135.)

According to Witt, the three defense lawyers discussed with Petitioner the ramifications of trial versus entering a guilty plea, and he believed Petitioner understood them. (Tr. 136.)   Witt testified that the Judgment and Commitment Order reflected the sentence explained to Petitioner in open court. (Tr. 141.)   Finally, Witt made it clear that he and Petitioner's other attorneys discussed with him the likelihood that he would spend the rest of his life incarcerated if they were unsuccessful at trial and that the State's plea proposal was a good deal. (Tr. 146.) Witt was satisfied that Petitioner thought "this was a good plea." (Tr. 146.)

Witt acknowledged that neither counsel nor the court could control the amount of time that a person remains incarcerated under a given sentence, and that "neither the court, the prosecutor or myself ever said this is a guarantee that was an eligibility date." (Tr. 148.)   Witt was then asked the following questions:

> FROELICH:  I guess I'm not seeing anything in the record about that because it seems like to me that the agreement was eight years down or less and, and that [ADC], can they not under a twenty-four year sentence if [Petitioner] didn't abide by the rules or didn't meet their requirements or they just decided to turn him down for parole they could keep him there for twenty-four years; isn't that correct?
>
> WITT: You make assumptions that you don't always put in the record and I'm assuming all other things being equal eight years down.

18

FROELICH: And what I'm saying though is that the actual amount of time that a person is going to be kept in the penitentiary under a given sentence is up to the prison people; isn't that right?

WITT: Absolutely. . . . Mr. Froelich, all right, any defense attorney that represents someone properly had to do some prognostication okay, otherwise you're going to get a Rule 37 back saying you didn't, all right?  Now, it was made clear to [Petitioner] that there was no guarantee on that.  The word that was utilized was his eligibility, all right.  Now, [ADC] many times disagrees with what I think is an eligibility date and I have to deal with them at times and have dealt with them at times on that but when I said eight years down I was talking about the time, the hard time, he would have to do before the pardon and parole board, and they call it something else now, would consider him eligible for parole.

(Tr. 148-149.)

During the Rule 37 hearing, Petitioner also testified that, on the morning of trial, Witt told him he did not want to try the case because he did not think he could win.  (Tr. 187.)  According to Petitioner, the only thing that was talked about was one sentence, not three.  (Tr. 189.)  According to Petitioner, he initially told his lawyers he would not accept an offer of eight years, but after his attorneys told him he would only have to do a "quarter date" of the eight years because the court would sentence him "under a statute because I was fifty-five years old," he changed his mind.  (Tr. 190.)  Petitioner's understanding of the agreement "was either eight or eleven years sentence, one sentence and then it would be on a quarter date" meaning that he would be "eligible" on a quarter of that time.  (Tr. 191-192.)  Petitioner denied that anyone talked to him about a 24-year sentence.  (Tr. 193.)  When asked why he did not object, at the end of the plea hearing, when the prosecutor recommended a 24-year sentence, Petitioner answered that he "didn't know what was going on and I just got confused in that part right in there because too many numbers got to coming at me."  (Tr. 194.)

In Petitioner's Rule 37 appeal, the Arkansas Supreme Court rejected Petitioner's argument

19

that his plea was unknowing or involuntary:

> Appellant further contends that the trial court stated an incorrect sentence range on the record. He adds that the discussion during the plea hearing concerning the plea agreement focused on "down time" of eight years, which he argues casts doubt upon whether the plea was voluntary and upon the terms of the agreement.

> As already discussed, the trial court was not obligated to accept the evidence of impaired mental capacity. In addition, while the sentencing range for each charge stated by the court during the plea hearing did not reflect the enhancement for habitual criminal status, it did indicate appellant could receive a sentence of life imprisonment. The State's recommended sentence was based upon habitual criminal enhancement. There was extensive discussion concerning the "down time" on the charges, with breaks for appellant to confer with his attorneys. Following one such break, the prosecutor indicated on the record that appellant was charged with one Y and two D felonies, "with habitual criminal."

> After those conferences, appellant personally agreed on the record to a sentence with the eight years down time the prosecutor had represented for the recommended sentences. The State then agreed to nolle prosequi an additional theft-by-receiving charge. The trial court, in accepting the plea, stated each sentence, and asked and received confirmation from defense counsel that each was correct. The court further confirmed with defense counsel and the prosecution that the twenty-four-year sentence was to run concurrently with the eleven-year sentence.

> Counsel testified at the postconviction hearing that it was made clear to appellant that there was no guarantee that he would only be incarcerated for eight years, and that the discussions concerning a possibility of reduction in time served based on appellant's age, or the age-fifty-five rule, were as to eligibility for parole. Counsel testified he had discussed with appellant his reasons for believing this was a good plea, pointing out that appellant was facing a life sentence on the robbery charge, and counsel was satisfied appellant recognized that the proposed agreement was a good plea.

> Appellant testified at the postconviction-relief hearing that he had not agreed to the down time, that he had agreed only to a "quarter date," that is, that he would be eligible for parole after one-quarter of either an eight or eleven years' sentence, based upon an application of the age-fifty-five rule, and that he did not know the actual sentence the prosecution would recommend until it was announced at the plea hearing. The trial court found that appellant understood the plea agreement and the sentence to be imposed.

> The trial court clearly determined that appellant's testimony was not credible.

Appellant's testimony shows that he has a good understanding of consecutive and concurrent sentences, the difference between the actual sentence and the down time discussed, and the age-fifty-five rule. Experience with the judicial system and a degree of sophistication in that regard are factors we consider when assessing whether a defendant is aware of the consequences of a guilty plea. *Peterson v. State*, 296 Ark. 324, 756 S.W.2d 897 (1988). With the record before us, we are satisfied that any deficiencies in substantial compliance with the Rule 24.5 requirement that the plea agreement be stated were overcome by the evidence presented in the postconviction-relief hearing concerning the information provided to appellant and appellant's knowledge and understanding of the sentencing range and actual plea agreement. We find no reversible error on this point.

*Pardue*, 363 Ark. at 572-73, 215 S.W.2d at 655-56.

Petitioner argues that his plea was not knowing and voluntary under *Boykin v. Alabama*, 395 U.S. 238 (1969) (holding that it is impermissible to assume that a guilty plea is voluntary and intelligent based upon a silent record) and *Johnson v. Zerbst*, 304 U.S. 458 (1938) (requiring voluntariness analysis to be applied to guilty plea).  The essence of Petitioner's argument is that his guilty plea was to a sentence of no more than eight years of "down time" and that the actual sentence he received exposed him to more than 8 years of incarceration.[10]   Respondent argues that there is no federal constitutional requirement that a defendant who pleads guilty understand collateral matters to the plea, such as parole eligibility. *See Hill v. Lockhart*, 474 U.S. 52 (1985) ("We have never held that the United States Constitution requires the State to furnish a defendant with information about parole eligibility . . . ."); *but see Meyers v. Gillis*, 93 F.3d 1147, 1153-54 (3rd Cir. 1996) (citing cases suggesting that "grossly erroneous information" provided by defense counsel concerning parole

---

[10]It is not clear from the record that the ADC has in fact made an adverse parole eligibility determination.  Petitioner seems to contend that he will have to serve at least 70% of his 24-year sentence before he is parole eligible, and that the "age 55" rule is not applicable to him.  Respondent does not dispute Petitioner's contention.  According to the ADC's public website, Petitioner's parole/transfer eligibility date is April 10, 2010, but that date "may be affected by other laws and regulations."  *See http://www.arkansas.gov/doc/inmate_info/search.php*.

eligibility may establish a cognizable habeas claim).

In making this habeas argument, Petitioner neither addresses nor explains how to get around the *presumptively correct factual findings* made by the Arkansas Supreme Court in denying his Rule 37 Petition. *See* 28 U.S.C. § 2254(e)(1). The Court credited Witt's testimony that he "made [it] clear" to Petitioner that there was *no guarantee* that he would be incarcerated for only eight years, and that the application of the age 55 rule was discussed in the context of *possible parole eligibility*.[11]   *See Pardue*, 215 S.W.3d at 655.   Importantly, the sentence actually imposed by the court at the conclusion of the plea hearing was the *identical sentence* recommended by the prosecutor at the beginning of the plea hearing.   Neither Petitioner nor his counsel had any objection or further comment when this sentence was announced at the end of the plea hearing.   Considering that Petitioner faced a life sentence in the event he was convicted of a Class Y felony, it is not surprising that defense counsel credibly believed that the plea offer was a good deal.   Finally, the record clearly reflects that Petitioner knowingly and voluntarily waived his right to a jury trial; his right to remain silent; and his right not to incriminate himself.   (Tr. 258-59.)

Petitioner has not come forward with any clear and convincing evidence to rebut the presumptive correctness of the factual findings made by the Arkansas Supreme Court..[12]   Thus,

---

[11]In this context, possible parole eligibility was a "collateral matter" to the *actual sentence recommended and imposed.*

[12]Petitioner emphasizes a May 23, 2003 unsigned letter purportedly sent by Witt to the trial court.  This letter was not part of the record in the Rule 37 proceeding.  (Docket entry #2 at 132-133, Ex. 15.)  In the letter, Witt related to the trial judge the parties' agreement of eight years "down time" and that, according to the ADC, petitioner's prior convictions and use of weapons in the aggravated assault would preclude application of the "age 55 rule."  Witt requested that the trial judge "consider correcting the Judgment and Commitment Order so that the intent of the parties is the end result."  Even if the Court were to consider this letter, it supports Witt's testimony that there was no guarantee of parole eligibility and that this calculation was left to the ADC.  Furthermore, these were

Petitioner has failed to show that the Arkansas Supreme Court's analysis was contrary to, or an unreasonable application of, federal law, or that it was an unreasonable determination of the facts based on the record of the state court proceeding. Accordingly, Petitioner's second ground for habeas relief is without merit, and should be denied.

### 3.     Alleged Involuntary Nature of Petitioner's Guilty Plea

Petitioner argues that his plea also was involuntary and unknowing because he was under the physical and mental stress of "torture" from deputies in the Washington County jail. (Docket entry #2 at 179-180.)   Furthermore, he claims that his attorneys and the trial court did nothing to investigate these allegations despite being informed about them. *Id.*

After he entered his guilty plea to the state charges, Petitioner filed a § 1983 action in which he alleged that, on August 2, 2002, the day he was booked into the Washington County jail, he was subjected to excessive force or punishment.   During the evidentiary hearing on Petitioner's § 1983 claims, testimony established that jailers placed him in a restraint chair, from 6:30 p.m. to 8:00 a.m. or 8:30 a.m. the next morning, because he was hostile and uncooperative during the booking process. United States District Judge Jimm Larry Hendren rejected Petitioner's claim that his initial placement in the chair constituted excessive force or punishment, but concluded that the length of placement was excessive and awarded Petitioner $1,500 in compensatory damages.   *See Pardue v. Glass, et. al.*, W.D. Ark. No. 05CV5004 JLH/JRM, at docket entries #82 and #92, 2008 WL 249173.

In asserting this federal habeas claim, Plaintiff admits that he never raised the claim in any of his state court post-conviction proceedings.  (Docket entry #40 at 2.)  In *Moore-El v. Luebbers*,

_____

facts that the Arkansas Supreme Court found were *communicated to Petitioner* in the guilty plea proceeding.

446 F.3d 890, 896-97 (8th Cir. 2006), the Court noted the long-established rule that a habeas petitioner "must present both the factual and legal premises" of the claim to each appropriate state court and afford those courts "a 'fair opportunity' to review its merits."

In an effort to establish grounds for excusing his procedural default, Petitioner argues that: (1) prior to entry of his guilty plea, he told the court and his attorneys that he was being tortured, but that he was ignored because they believed he was "just crazy"; and (2) he was afraid to raise the issue in the Rule 37 proceeding because he knew he would return to his Washington County jailers for his Rule 37 hearing.  (Docket entry #40 at 2-3.)  The Eighth Circuit has held that:  "For the purpose of reviewing a defaulted constitutional claim, 'the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Greer v. Minnesota*, 493 F.3d 952, 958 (8th Cir. 2007) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

After carefully considering Petitioner's arguments, the Court concludes that he has failed to show cause for his procedural default.  In ruling in favor of Petitioner on his § 1983 excessive force or punishment claim, the Court made it clear that Petitioner was only subjected to excessive punishment on August 2, 2002, the day he was booked into the Washington County jail on the state charges.  Importantly, the imposition of this punishment was found to be an isolated event that took place several months *before* he entered his guilty plea.

Finally, even though these facts were known to Petitioner at the time of the postconviction proceedings, he failed to raise this issue.  Petitioner consistently has demonstrated his ability to raise postconviction claims in state court in both *pro se* Rule 37 pleadings, and later through counsel. Thus, because Petitioner has procedurally defaulted this argument, it must be rejected as a ground

for habeas relief.[13]

### 4.      Alleged Absence of a Factual Basis for the Guilty Plea

Petitioner next contends that his guilty plea was invalid because he did not affirm the factual basis for the plea.  As indicated earlier, the prosecutor stated the factual basis for the plea, but Petitioner did not affirm or otherwise indicate that these facts were true.

As part of the guilty plea colloquy, Rule 24.6 of the Arkansas Rules of Criminal Procedure requires that a factual basis for a guilty plea should be presented.  In addressing this argument in Petitioner's Rule 37 appeal, the Arkansas Supreme Court noted that the better practice was for the trial court to ask the defendant whether he committed the acts charged.  However, the Court went on to hold that the post-conviction record established a sufficient factual basis because trial counsel testified during the Rule 37 hearing that the State could present eyewitnesses who would identify Petitioner.  *Pardue*, 363 Ark. at 573, 215 S.W.2d at 656.

Respondent contends that, regardless of whether the factual basis requirements of Ark. R. Crim P. 24.6 were satisfied, this is not a cognizable habeas claim because it does not implicate federal constitutional issues.  The Court agrees.  *See. e.g. Lott v. Hargett*, 62 F.3d 396 (5th Cir. 1995) (*per curiam*) (distinguishing cases involving the factual basis requirements of the Federal Rules of Criminal Procedure and noting that "State courts are under no constitutional duty to establish a factual basis for the guilty plea prior to its acceptance, unless the judge has specific notice that such an inquiry is needed"); *Wabasha v. Solem*, 694 F.2d 155, 156 (S.D. 1982) ("the factual basis

---

[13]On March 28, 2008, Petitioner filed a Motion to Amend his habeas Petition to further elaborate on his claim that his guilty plea was involuntary based on his having been subjected to excessive punishment while being booked into the Washington County jail on August 2, 2002.  For the reasons explained in a separate Order (docket entry #41), the Court has denied this Motion to Amend.

requirement rests in Fed. R. Crim. P. 11(f), not the Constitution."); *Page v. Lafler*, 2008 WL 474076 (E.D. Mich. February 19, 2008) ("Because the writ of habeas corpus exists only to correct errors of federal law, a state court's failure to elicit a factual basis for a guilty plea does not state a claim cognizable on habeas review")  Thus, the Court recommends that this ground for habeas relief be denied.

5.      **Alleged Insufficiency of the Charging Information**

Finally, Petitioner argues that the charging information did not provide him with fair notice of the aggravated robbery charge, because it did not allege that he had the "purpose of committing a theft" or that he "resisted apprehension immediately after" the theft as those statutory elements are reflected in Ark. Code Ann. § 5-12-202 and -203.[14]  Without these elements, Petitioner contends that he was deprived of fair notice and due process.  (Docket entry #33.)

In Petitioner's state habeas appeal, the court rejected this argument, holding that the amended information was sufficient because it "charged [Petitioner] with aggravated robbery, named [Petitioner], specified the county where the offense was committed, and stated the facts asserted to constitute the offense." *Pardue v. Norris*, 2007 WL 117427 (Ark. 2007).  The court also noted that Petitioner did not raise the issue of a defective information until after his entry of a guilty plea, and

_____

[14]A person commits aggravated robbery if: (1) with the purpose of committing a . . . theft or resisting apprehension immediately after committing a . . . theft, the person employs or threatens to immediately employ physical force upon another person; and the person is (2) armed with a deadly weapon; (3) represents that he is armed with a deadly weapon; or (4) inflicts or attempts to inflict death or serious bodily injury upon another person.  Ark. Code Ann. 5-12-102 and -103.  The Information and Amended Information charge Petitioner with aggravated robbery in violation of Ark. Code Ann. § 5-12-103, alleging that, "[o]n or about July 5, 2001, defendant unlawfully and feloniously, while armed with a deadly weapon, or representing by word or conduct that he was so armed, committed aggravated robbery . . . to-wit: Defendant, while armed with a knife, stole from Wal-Mart and attempted to stab an employee who tried to stop the defendant."  (Tr. 5 [Information]; Docket entry #22, Exhibit 4 [Amended Information].)

had never sought additional details about the charges by filing a bill of particulars.  *Id.*

    The sufficiency of a state charging instrument is primarily a question of state law, although due process requires that a person receive fair and reasonable notice of the charges against him. *Wilkerson v. Wyick*, 806 F.2d 161, 164 (8th Cir. 1986); *see also Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir.1993) ("Sufficiency of a state charging instrument is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction over the case."); *Jones v. Bradshaw*, 2006 WL 2849766 (N.D. Ohio 2006) (on federal habeas review the "sole Constitutional issue is whether the indictment provides the defendant with sufficient information of the charged offense, to enable him to defend himself against the accusations.")

    As noted by the Arkansas Supreme Court, the charging information placed Petitioner on notice of the aggravated robbery charge against him and the facts constituting the offense.  While the charging instrument did not precisely track the language of the statutory elements, it did allege that Petitioner, "while armed with a knife, stole from Wal-Mart. . . attempted to stab an employee who tried to stop [him]."  *See* Docket entry #22, Exhibit 4.  These allegations sufficiently notified Petitioner that he  had the "purpose of committing a theft" and "resisted apprehension" with regard to the theft.

    Petitioner has not shown that the Arkansas Supreme Court's disposition of this claim was contrary to, or an unreasonable application of, federal law, or that it was an unreasonable determination of the facts based on the record of the state court proceeding. Thus, the Court concludes

that Petitioner's fourth ground for habeas relief has no merit, and recommends that it be denied.[15]

### III. Conclusion

IT IS THEREFORE RECOMMENDED that the Petition and Amended Petition for Habeas Corpus under 28 U.S.C. § 2254 (docket entries #2 and #33) be DENIED, and that this case be DISMISSED, WITH PREJUDICE.

Dated this 31st day of March, 2008.

_____
UNITED STATES MAGISTRATE JUDGE

---

[15]Respondent alternatively argues that Petitioner's fourth claim, raised in his Amended Petition, is barred by the statute of limitations because the Amended Petition did not relate back to filing of the original Petition. Because the Court concludes that Petitioner's claim fails on the merits, it need not address Respondent's statute of limitations defense.